PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

ROBERT JUNIOR WARDRICK,
          *Defendant-Appellant.*

No. 02-4494

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, District Judge.
(CR-01-217-AMD)

Argued: September 24, 2003

Decided: November 20, 2003

Before WIDENER, TRAXLER, and KING, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Widener and Judge Traxler joined.

## COUNSEL

**ARGUED:** Denise Charlotte Barrett, Assistant Federal Public Defender, Baltimore, Maryland, for Appellant. Debra L. Dwyer, Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Baltimore, Maryland, for Appellant. Thomas M. DiBiagio, United States Attorney, Baltimore, Maryland, for Appellee.

**OPINION**

KING, Circuit Judge:

Robert Junior Wardrick appeals from his convictions and sentence in the District of Maryland for violating 18 U.S.C. § 922(g)(1) and 26 U.S.C. § 5861(d).[1] Seeking to vacate his convictions, Wardrick raises three Fourth Amendment issues concerning the district court's denial of his motion to suppress evidence seized pursuant to a search warrant. Challenging his sentence of 300 months, Wardrick contends that the court erred in finding him to be an "armed career criminal" under 18 U.S.C. § 924(e)(1). Because each of these contentions is without merit, we affirm.

I.

While auditing ammunition sales logs at three Baltimore retail stores in January, 2000, Detective Robert Overfield of the Baltimore City Police Department noted several sales to Robert Wardrick. More specifically, the records reflected that Wardrick had recently purchased .32 caliber and .357 Magnum ammunition, as well as .410 gauge shotgun shells. These transactions attracted Det. Overfield's interest because he had previously arrested both Wardrick and his wife, Mary Frances, on firearms charges. Moreover, Det. Overfield knew that each was prohibited from possessing firearms because of prior felony convictions.

In fact, Det. Overfield had been present on December 18, 2000, when Wardrick was convicted of a firearms felony in Maryland state court. Immediately after the state court conviction, Det. Overfield heard Wardrick assert that he always carried a loaded gun and that he "never missed." At that time, Wardrick also made references to assaulting police officers. Believing that Wardrick might illegally

---

[1] Pursuant to 18 U.S.C. § 922(g)(1), it is unlawful for any person "who has been convicted . . . of, a crime punishable by imprisonment for a term exceeding one year" to possess "any firearm or ammunition." Section 5861(d) of Title 26 makes it unlawful for any person "to receive or possess a firearm [such as a sawed-off shotgun] which is not registered to him in the National Firearms Registration and Transfer Record."

possess firearms, Det. Overfield investigated further. In his investigation, Det. Overfield reviewed various records, including motor vehicle records, parole and probation records, and tax and assessment records. Det. Overfield also obtained information on Wardrick from Verizon, a private telecommunications corporation. The investigation revealed that Wardrick was the mortgagee of property located at 1808 Division Street in Baltimore. On January 11, 2001, Det. Overfield conducted surveillance at that address, observing two vehicles bearing Virginia license plates registered to Robert Wardrick.

On January 22, 2001, Det. Overfield sought and obtained a search warrant from a judge of the District Court for Baltimore County "to enter **without knocking** and search the premises at **1808 Division Street, Baltimore,** . . . [t]o search for, seize and remove therefrom any and all parts thereof any UMC brand .357 Magnum ammunition, and any firearms including but not limited to a .357 magnum handgun and a .32 caliber pistol, boxes, receipts, or manuals relating to said firearms." (emphasis in original).[2] In requesting the court to authorize a "no-knock" entry to the premises, Det. Overfield presented an affidavit (the "Overfield Affidavit") reflecting that "Wardrick ha[d] a history of arrests making him a likely threat to a police officer." The Overfield Affidavit identified Wardrick as having three prior convictions for firearms offenses and three for battery, plus convictions for assault, resisting arrest, and escape. It further asserted that "[t]his history as well as comments made by the subject regarding the likely presence of firearms would necessitate a no-knock warrant for officer safety reasons."[3]

---

[2]In securing the search warrant, Det. Overfield complied with § 1-203 of the Code of Maryland Criminal Procedure, which establishes procedural requirements for issuance of a search warrant.

[3]The Overfield Affidavit detailed Det. Overfield's experiences with Wardrick and his recent ammunition purchases. It then laid out Wardrick's lengthy criminal record, and it explained the circumstances prompting Wardrick's threatening comments "intended to be overheard" by Det. Overfield.

The Overfield Affidavit also detailed Det. Overfield's manner of ascertaining the Division Street address. It explains that Det. Overfield "conducted a check through a local utility and found that Robert J. Ward-

At 5:15 a.m. on January 23, 2001, seven Baltimore police officers executed the search warrant at the Division Street residence. After awakening and detaining Wardrick, the officers searched the master bedroom of the residence, seizing a loaded 9mm Ruger from beneath a pillow of the bed where Wardrick had been sleeping. The officers also seized from the bedroom a sawed-off 12 gauge shotgun, a .357 Magnum revolver, numerous rounds of ammunition, a pellet gun, Wardrick's automobile operator's license, a gas and electric bill, and a refund notice. The bill and the refund notice each bore Wardrick's name and the Division Street address. The officers also searched the balance of the residence and seized additional evidence, including another .357 Magnum, a 12 gauge shotgun, a .22 rifle, a .410 sawed-off shotgun, a starter pistol, an empty box labeled "Beretta," and two holsters.

On June 29, 2001, a federal grand jury in Baltimore returned a three-count indictment against Wardrick, charging, inter alia, the illegal possession of firearms by a felon, in violation of 18 U.S.C. § 922(g)(1), and the unlawful possession of sawed-off shotguns, in violation of 26 U.S.C. § 5861(d).[4] Prior to trial, Wardrick moved the

rick has been receiving utility service at 1808 Division Street, Baltimore . . . since April of 2000;" that he "contacted the Baltimore City Division of Parole and Probation and determined that Mary Frances Wardrick['s] . . . telephone number was (410) 383-2509 and that she listed her current address as 1808 Division Street, Baltimore;" that he "conducted a check through a different utility company [Verizon] and confirmed that the telephone number (410)383-2509 was active and was listed to Robert J. Wardrick at 1808 Division Street, Baltimore;" that he "conducted a check through the records of the Maryland Department of Taxation and Assessments," which revealed that "Robert J. Wardrick is the current mortgage holder at 1808 Division Street, Baltimore," that Wardrick "purchased the home on 5/9/00," and that Wardrick "lists the address as his primary residence." Det. Overfield also "conducted surveillance at 1808 Division Street, Baltimore," on January 11, 2001, and "observed two vehicles . . . registered to Robert Junior Wardrick."

[4]Specifically, Count One of the indictment charged that Wardrick "did knowingly and unlawfully possess firearms" after "having been convicted of a crime punishable by imprisonment for a term exceeding one

district court to suppress the evidence seized from the Division Street residence. The suppression motion made three separate contentions concerning the search: (1) that the search was unconstitutional because the officers failed to "knock and announce" prior to entering the residence; (2) that the Overfield Affidavit was premised on information unconstitutionally obtained from Verizon's business records; and (3) that the seizure of certain items, such as the gas and electric bill and the refund notice, unconstitutionally exceeded the scope of the warrant.

On October 12, 2001, the district court conducted a hearing on the suppression issues. In denying the motion from the bench, the court made several pertinent findings of fact. First, in determining that the authorization for a no-knock entry was justified, the court found that Wardrick had a violent criminal history, that he had made threatening statements in Det. Overfield's presence, and that he had purchased ammunition, indicating that he likely possessed firearms. Second, in concluding that the Verizon information was not unconstitutionally obtained, the court observed, pursuant to the affidavit, that Det. Overfield had secured Wardrick's address and phone number from other records before obtaining any such information from Verizon. Moreover, the court found that Verizon had voluntarily provided the information upon request. Third, in addressing the items not specified in the warrant, the court upheld their seizure under both the terms of the warrant and the plain view doctrine. After its denial of the motion to suppress, the court entertained and denied Wardrick's motion for reconsideration.

During Wardrick's trial, which was conducted in Baltimore in May, 2002, the prosecution introduced the evidence seized under the

---

year," in violation of 18 U.S.C. § 922(g)(1). Count Two charged that Wardrick "did knowingly and unlawfully receive and possess firearms, specifically shotguns . . . having barrels of less than 18 inches in length, which [were] not registered to him in the National Firearms Registration and Transfer Record," in violation of 26 U.S.C. § 5861(d).

The indictment also contained a Count Three, in which Wardrick was charged with a second § 922(g)(1) offense. Count Three was later dismissed.

search warrant. At the trial's conclusion, the jury convicted Wardrick of violating both § 922(g)(1) and § 5861(d). On September 13, 2002, the district court sentenced Wardrick under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1) (the "ACCA").[5] Maintaining that ACCA did not apply to his situation, Wardrick asserted that his prior convictions for assault, battery, resisting arrest, and escape were not violent felonies. The court, however, ruled to the contrary. On September 17, 2002, Wardrick was sentenced to 300 months on his § 922(g)(1) conviction, plus a concurrent term of 120 months on his § 5861(d) conviction, followed by supervised release. Wardrick filed a timely notice of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

In considering a district court's denial of a motion to suppress evidence, we review the court's factual findings for clear error and its legal determinations de novo. *United States v. Rusher*, 966 F.2d 868, 873 (4th Cir. 1992). In considering an appellate challenge to a sentence, we examine legal issues de novo. *United States v. Daughtrey*, 874 F.2d 213, 217-18 (4th Cir. 1989). However, "[w]e review the district court's findings of fact at sentencing only to assure ourselves that they are not clearly erroneous." *United States v. Hobbs*, 136 F.3d 384, 387 n.5 (4th Cir. 1998) (quoting *United States v. Crump*, 120 F.3d 462, 468 (4th Cir. 1997)). Accordingly, in reviewing a district court's application of ACCA, we review its legal determinations de novo and its factual findings for clear error. *See United States v. Brandon*, 247 F.3d 186, 188 (4th Cir. 2001).

## III.

Wardrick raises four separate contentions on appeal. His first three challenges relate to the district court's denial of his motion to suppress, and his fourth contention concerns the calculation of his sentence. First, Wardrick contends that the search of his Division Street residence was unconstitutional because the officers did not "knock and announce" prior to executing the warrant. Second, Wardrick

---

[5]A person who meets the ACCA definition of armed career criminal shall be "imprisoned not less than fifteen years." *See infra* Part III.D.

maintains that the search warrant was invalid because the Overfield Affidavit relied on information obtained unconstitutionally from Verizon. Third, Wardrick asserts that certain items not specified in the warrant should have been suppressed because their seizure unconstitutionally exceeded the scope of the warrant. Finally, Wardrick maintains that the court erred in sentencing him as an "armed career criminal" under ACCA because his prior convictions for assault, battery, resisting arrest, and escape were not violent felonies. We assess these contentions in turn.

## A.

We first consider whether the district court erred in denying Wardrick's motion to suppress because the officers failed to "knock and announce" prior to executing the warrant. Under Fourth Amendment precedent, officers are generally required, when executing a search warrant, to knock and announce their identity and purpose before attempting forcible entry into a residence. *Richards v. Wisconsin*, 520 U.S. 385, 387 (1997); *see also* 18 U.S.C. § 3109 (codifying knock and announce requirement with respect to federal officers). As Judge Widener has recently recognized, the knock and announce requirement serves three purposes: "(1) protecting the safety of occupants of a dwelling and the police by reducing violence; (2) preventing the destruction of property; and (3) protecting the privacy of occupants." *United States v. Dunnock*, 295 F.3d 431, 434 (4th Cir. 2002) (quoting *Bonner v. Anderson*, 81 F.3d 472, 475 (4th Cir. 1996)).

We have recognized that, under appropriate exigent circumstances, strict compliance with the knock and announce requirement may be excused. *United States v. Grogins*, 163 F.3d 795, 797 (4th Cir. 1998) (holding no-knock entry justified where officers had reasonable suspicion that entering drug "stash house" would be dangerous and drug dealer frequenting house could not be found elsewhere). When the authorities "have a reasonable suspicion that knocking and announcing their presence . . . would be dangerous or futile, or that it would inhibit the effective investigation of [ ] crime by, for example, allowing the destruction of the evidence," an entry without knocking is justified. *Richards*, 520 U.S. at 394; *see also United States v. Ramirez*, 523 U.S. 65 (1998) (upholding no-knock entry where suspect had violent past, access to weapons, and vowed not to do "federal time").

In this situation, the state court judge made a specific determination that the circumstances explained in the Overfield Affidavit justified the issuance of a no-knock search warrant. As the Overfield Affidavit recounts, Wardrick had a violent criminal history, including a battery conviction stemming from resisting arrest. Moreover, the affidavit suggested that Wardrick, a convicted felon, illegally possessed firearms. Indeed, Wardrick had threatened, in the presence of Det. Overfield, that he always carried a loaded gun and that he "never missed." Lastly, Det. Overfield reasonably believed that Wardrick would be present when the warrant was executed. As the Overfield Affidavit reflects, several records indicated that 1808 Division Street was Wardrick's primary residence, and two automobiles registered in his name had been parked outside the residence only days before the search warrant was secured.

Based on our review of the Overfield Affidavit, we agree with the district court that it was reasonable for Det. Overfield and the state court to believe that execution of the search warrant would be dangerous. *See Ker v. California*, 374 U.S. 23, 40-41 n.12 (1963) (determining lawfulness of entry depends on "what the officers had reason to believe *at the time of their entry*") (emphasis in original). In such circumstances, the issuance of the no-knock search warrant was justified, and the district court did not err in declining to suppress the evidence on this basis.

### B.

We turn next to Wardrick's challenge to the search warrant's validity on the basis of information obtained from Verizon. Specifically, Wardrick asserts that Det. Overfield's questioning of his contacts at Verizon to confirm Wardrick's unlisted phone number and address violated his reasonable expectation of privacy.

Even if we assume that Wardrick possesses standing to assert a Constitutional deprivation on this point, his contention is without merit. As the Overfield Affidavit reflects, Wardrick's address and phone number had been obtained from other records before Det. Overfield contacted Verizon. *See supra* n.3 (detailing Det. Overfield's earlier acquisition of pertinent information from local utility records, parole and probation records, and tax and assessment records). This

fact, which demonstrates that Det. Overfield had an earlier, independent source for this information, undermines Wardrick's challenge to the warrant's validity. *See Sutton v. United States*, 267 F.2d 271, 272 (4th Cir. 1959) ("It is one thing to say that officers shall gain no advantage from violating the individual's rights; it is quite another to declare that such a violation shall put him beyond the law's reach even if his guilt can be proved by evidence that has been obtained lawfully."); *see also Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920) (noting that even illegally obtained facts are not "sacred and inaccessible" and "[i]f knowledge of them is gained from an independent source they may be proved like any others").[6]

## C.

Wardrick also maintains that, in their execution of the search warrant, the officers unconstitutionally seized items that exceeded the warrant's scope. He asserts that the seizure of his gas and electric bill, the refund notice, his automobile operator's license, two holsters, a starter pistol, and a pellet gun (collectively, the "unspecified items") was improper. Accordingly, he contends that the district court erred in refusing to suppress the unspecified items.

The search warrant authorized the seizure at the Division Street residence of "any firearms including but not limited to a .357 magnum handgun and a .32 caliber pistol, boxes, receipts, or manuals relating to said firearms." Given the explicit provisions of the warrant, we easily dispose of Wardrick's challenge to the seizure of the starter pistol and the pellet gun. First, the starter pistol falls explicitly within the warrant's specification of "any firearms." *See* 18 U.S.C. § 921(a)(3) ("The term 'firearm' means . . . any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive."). A pellet gun, on

---

[6]In disposing of this contention, we do not suggest that Det. Overfield contravened the Constitution in contacting or questioning Verizon employees. To the contrary, the Fourth Amendment does not preclude law enforcement officers from non-coercively questioning third parties in their quest for information. *See Texas v. Cobb*, 532 U.S. 162, 171-72 (2001) ("[I]t is critical to recognize that the Constitution does not negate society's interest in the ability of police to talk to witnesses . . . .").

the other hand, has been characterized as "a dangerous weapon but not a firearm." *See United States v. Davis*, 202 F.3d 212, 218 n.8 (4th Cir. 2000) (citing Guidelines commentary). Nevertheless, the terms of the search warrant were not contravened by the seizure of the pellet gun. This gun was not seized in an indiscriminate manner, but with ample reason to believe that, in these circumstances, it was of the same ilk as the other weapons discovered in the Division Street arsenal.

Furthermore, our review of the pertinent facts compels the conclusion that the district court did not err in finding that the other unspecified items were also properly seized. For example, the gas and electric bill, the refund notice, and the operator's license constitute evidence linking Wardrick to the premises where the illegal firearms were found. *See Warden v. Hayden*, 387 U.S. 294 (1967); *see also United States v. Williams*, 623 F.2d 535 (8th Cir. 1980) (holding seizure of plumbing bill proper where search warrant described cocaine and heroin because bill constituted "mere evidence," showing that defendant occupied premises where drugs found). Likewise, the holsters were properly seized — they further linked Wardrick to the illegal possession of firearms. In sum, the court did not err in declining to suppress the unspecified items.

D.

Wardrick's final contention on appeal relates to the district court's imposition of his sentence. He asserts that the district court erred in characterizing him as an "armed career criminal." Pursuant to ACCA, a person convicted under § 922(g) who "has three previous convictions . . . for a violent felony" shall be imprisoned not less than fifteen years. 18 U.S.C. § 924(e)(1). According to ACCA:

> the term "violent felony" means any crime punishable by imprisonment for a term exceeding one year . . . that— (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or (ii) is burglary, arson, or extortion, involves the use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

*Id.* § 924(e)(2)(B); *see also* U.S. Sentencing Guidelines Manual § 4B1.2.

In sentencing Wardrick as an "armed career criminal," the district court reviewed and assessed his earlier felony convictions. The court determined that five of those convictions were violent felonies under ACCA: (1) his 1983 Maryland conviction for common-law assault;[7] (2) his 1984 Maryland conviction for escape; (3) his 1986 Maryland conviction for common-law battery; (4) his 1988 Maryland conviction for resisting arrest, and (5) his 1988 Maryland conviction for common-law battery. Although Wardrick concedes that his 1986 battery conviction was a violent felony, he maintains on appeal that the court erred as to the other four convictions.[8] As explained below, at least four of these five prior convictions were violent felonies under ACCA, and Wardrick's contention that he was improperly sentenced must be rejected.

In assessing whether earlier convictions constitute violent felonies for purposes of ACCA, a court is first obliged to utilize the "categorical approach" ordinarily employed in determining career criminal status. *See United States v. Kirksey*, 138 F.3d 120, 124 (4th Cir. 1998) (determining whether prior felony constitutes crime of violence depends on whether elements of prior offense involved conduct presenting serious risk of physical injury to another); *see also Taylor v. United States*, 495 U.S. 575, 600 (1990). This categorical approach requires the court to rely only upon the fact of conviction and the definition of the prior offense. *Kirksey*, 138 F.3d at 124. If the definition of the prior offense is ambiguous, however, the court must look beyond the definition to the charging document and to any statements incorporated into that document.[9] *Kirksey*, 138 F.3d at 124-26. In con-

---

[7]Wardrick was convicted in November of 1983 in Baltimore City of common-law assault. He was sentenced on this offense in January of 1984.

[8]Because Wardrick concedes that his 1986 Maryland conviction for common-law battery was a violent felony, his sentence under ACCA must be upheld if the district court correctly characterized two of the other four convictions as violent felonies.

[9]For purposes of our analysis of this issue, we assume that the Maryland common-law crimes of assault and battery were ambiguous when

ducting its ACCA assessment, a court may also consult the jury
instructions in the earlier case to determine whether the prior convic-
tion constitutes a violent felony. *See United States v. Coleman*, 158
F.3d 199, 202 (4th Cir. 1998) (en banc).

The instructions underlying Wardrick's 1983 assault conviction
support the proposition that the district court did not err in character-
izing that conviction as a violent felony. In Maryland, a common-law
assault "presents the unusual situation in which an offense may be
committed in one of two ways — one of which requires the use,
attempted use, or threatened use of physical force and one of which
does not." *Coleman*, 158 F.3d at 202. Because of this ambiguity, we
have been "unable to conclude that a Maryland conviction for
common-law assault is per se a violent felony within the meaning of
§ 924(e)(2)(B)(i)." *Id.* However, the jury instructions in Wardrick's
1983 assault trial in Baltimore City defined assault, under Maryland
law, as "a threat by words or acts or both to do bodily harm to
another, coupled with the apparent present ability to carry out the
threat." In light of that instruction, the jury, in finding Wardrick guilty
of common-law assault, convicted him of a violent felony; i.e., the
guilty verdict had "as an element the . . . threatened use of physical
force against the person of another."[10] *See* 18 U.S.C. § 924(e)(2)(B).

---

Wardrick was convicted and sentenced for those offenses. *See Kirksey*,
138 F.3d at 125. For example, an assault was either an attempted battery
or an intentional placing of a victim in reasonable apprehension of an
imminent battery. *See Lamb v. State*, 613 A.2d 402, 407-12 (Md. Ct.
Spec. App. 1992). A battery was the "unlawful beating of another," and
it included "*any* unlawful force used against a person of another, *no mat-
ter how slight*." *State v. Duckett*, 510 A.2d 253, 257 (Md. 1986) (empha-
sis in original). Accordingly, battery embraced a wide range of conduct,
including "kissing without consent, touching or tapping, jostling, and
throwing water upon another." *Epps v. State*, 634 A.2d 20, 23 (Md. Ct.
Spec. App. 1993).

[10]In affirming Wardrick's 1983 assault conviction, the Court of Special
Appeals of Maryland observed that his conviction was secured on evi-
dence indicating that Wardrick "assaulted [his victim] by striking her in
the face" and "forc[ing] her to have sexual intercourse with him." *Ward-
rick v. Maryland*, No. 1232, slip op. at 1 (Md. Ct. Spec. App. May 6,
1985).

The district court also properly characterized Wardrick's 1984 Maryland conviction for escape as a violent felony. As we have indicated, felony escape and attempted escape constitute violent felonies under ACCA — even if accomplished by stealth. *See generally United States v. Hairston*, 71 F.3d 115 (4th Cir. 1995) (holding felony escape in North Carolina to be crime of violence under ACCA because escape presents risk of injury to others); *United States v. Aragon*, 983 F.2d 1306, 1313 (4th Cir. 1993) (holding attempt to rescue prisoner and assisting in escape to be crimes of violence because of inherent risk of force).

Likewise, the district court accurately characterized Wardrick's 1988 conviction for resisting arrest as a violent felony. The act of resisting arrest poses a threat of direct confrontation between a police officer and the subject of the arrest, creating the potential for serious physical injury to the officer and others. *See United States v. James*, 337 F.3d 387 (4th Cir. 2003) (holding South Carolina conviction for failure to stop for a blue light to be violent felony under ACCA because prohibited conduct creates potential for confrontation and violence). Accordingly, Wardrick's conviction for resisting arrest is properly characterized as a violent felony pursuant to ACCA.

Because Wardrick had been convicted of at least four violent felonies — battery, assault, escape, and resisting arrest — the district court did not err in sentencing him under ACCA as an "armed career criminal."[11]

IV.

Pursuant to the foregoing, we affirm Wardrick's convictions and sentence.

*AFFIRMED*

---

[11]We are not convinced that the district court properly characterized Wardrick's 1988 battery conviction as a violent felony, in that the jury instructions in that trial spoke only of an "offensive touching." This ambiguity notwithstanding, the violent nature of that crime need not, in light of Wardrick's four other violent felony convictions, be resolved in this appeal.